this is 19 to 195 Miss Duncan and again Mr. Williams and Miss Duncan will be delighted to hear from you whenever you're ready. Good morning, your honor. Thank you. May it please the court. Mr Baca in his brief raises two primary issues for reversal of his conviction, one being a claim that the government violated his rights to due process by withholding, suppressing or delaying the disclosure of critical Brady and impeachment information. And number two, that the district court erred in allowing the government to admit evidence that Mr. Baca had committed a murder in 1989 that had only minuscule probative value to the case and extreme prejudicial value. And I'd like to start by talking with the court about the Brady issue. And I'd like based on the the court's questions during Mr via his argument, I'd like to walk the court through the timing of the disclosures and what was contained in those disclosures and why it was prejudicial. First were the calls that were disclosed first November 14 of 2017, but were inaccessible to the defense. And so we're really disclosed to us in the beginning of December, which was two and a half months before trial. And as the disclosure, there were 15,000 phone calls on that disclosure. Oh, I'm sorry, 15,000 hours of phone calls 60,000 phone calls. And a vast majority of those calls were of codefendants, either of the codefendants at the trial, our clients or of the government's witnesses for trial one. And included in those calls were calls by government witness Lupe Arquizo. Because of the timing of the disclosure and the defense having to prepare for trial, the defense was unable to uncover from that initial disclosure, three phone calls between Mr. Arquizo and his different girlfriends discussing his review of discovery on discovery tablets that had been provided to the defendants in the case. And this was and is and is the point there that he could learn of the government's theory or everyone could learn of what the government's theory is. And they could basically, as we would say, sing from the same songbook. That's correct, Your Honor. So in one of the calls, Mr. Arquizo describes to his girlfriend, a letter that Mr. Baca wrote to the Department of Corrections Administration, trying to negotiate to get himself out of the protective custody. And one of the government's alternative theories for the Molina murder was that it was in retaliation for the Department of Corrections, not letting Mr. Baca out of custody. So Mr. Arquizo was exposed to that through the tablets. And he was also able, the calls established that Mr. Arquizo discussed that discovery with other testifying witnesses in this case, which was critical to our defense. And we're looking at this under Brady, right? Your argument. So I think the government has conceded everything but materiality on these calls. Maybe I'm wrong, but I thought so. And the question I have is, it appears that, how do you pronounce his name, Mr. Arquizo? Arquizo. Arquizo. That he, although there wasn't a village, you weren't able to cross examine him about accessing these tablets. And in fact, he said he never did. Certainly, it came out extensively that he was housed with co-defendants, and he had multiple opportunities to discuss the prosecution's theory with the other prosecution witnesses, including that he had actually reviewed some of the written materials on other people's cases while he was incarcerated. Doesn't that affect the materiality of this phone call? It clearly affects, but it does not, the phone call was still incredibly material. And let me explain why. So for Mr. Baca's case, the case as to the Molina murders was built on the testimony of seven cooperating witnesses. There was no video, no written evidence, no documentary evidence, no confession. It was just these seven cooperators. Five of those cooperators were co-defendants who had access to their own discovery tablets. Two of the witnesses, Mr. Arquizo and Eric Duran, did not have access. Both Mr. Duran and Mr. Arquizo lied to the jury about having access to the tablets. We were able to impeach Mr. Duran on this point because we had his phone calls and had been able to review them. We were unable to impeach Mr. Arquizo because we didn't have the call. Had we had it in time to use it at trial, that would have been powerful evidence of the corroboration. Not only that the cooperating witnesses had talked about the case, but that they understood the importance of having access to those discovery tablets such that the two witnesses who were not given them in the case felt the need to lie about it. And so I guess one of the things when you look at the transcript here and the cross examination that was implemented against these testifying witnesses, I mean, I think Judge Briscoe already said this, none of them came across very well. And frankly, you know, I've been an appellate judge now for 16 years, I've never seen the kind of benefits that these people received in terms of money put in their accounts. I mean, that all came out at trial. So it seems to me that the additional benefit that you get by saying not only did he discuss it with everybody when they were sharing cells, and not only did he look at other people's paperwork, and not only was he rewarded very generously for testifying, by the way, he also lied about that he actually looked at somebody else's tablet. I just I don't think it adds a lot. Tell me why I'm wrong. I mean, I respectfully disagree, Your Honor, I think because it does emphasize how important it was to have access to those tablets to understand the evidence that the government had amassed and its theory of the of its case. And I think you should also consider it in connection with the FBI questionnaire that was also disclosed too late for the defense to be able to use it effectively. But another defendant used the questionnaire, didn't they? The other defendant used the questionnaire too late in the trial, it was after so that that discovery was disclosed, I believe it was on January 30 of 2018. So the second day of voir dire. So although it was disclosed to us, it wasn't identified until much later in the trial, after some many of the cooperating witnesses had already testified, so we couldn't use it. And we couldn't, we couldn't use it in our opening statements to lay out that part of the case. Sanchez, as I understand it, called agent Sonata didn't stand to talk about that very questionnaire. And then as the sort of the, the elephant in the room is that, well, then then agent, you know, the same chance had not yet closed his case. And so Sanchez or frankly, either of Mr. Herrera or Mr. Baca then could have recalled Mr. Urquizo, Urquizo, or frankly, any of the witnesses to then inquire of them. Well, you know, how do you interpret this, these questionnaires? Wasn't this a blueprint for how to get money, how to be able to get access to the tablet so you can access pornography and the like all, you know, this, all of these benefits that gentleman Q is alluding to. So how can you argue that the questionnaire or frankly, the type notes for Mr. Urquizo were suppressed when they were elicited, uh, you know, prior to the close of evidence? Your honor, because we were denied the opportunity to craft defense theories and opening statements and original cross examination based on this so the jury had already heard Urquizo testify or I'd heard these witnesses testified, made their notes, made whatever credibility determinations they had, they made for those witnesses. And now we were going to go back and try to integrate this new evidence in a way that was effective and it just wouldn't have happened. And it's particularly important because when you look through the transcripts, these were incredibly hostile witnesses to the defense. So our benefit of our, of our cross examinations was the original cross examination, having information that we could use to impeach these witnesses and to show that they were lying to the jury. So it would have made a difference for us to have it at the very beginning and to be able to form our case based on it. And that's a good point. But I guess, but how do you then respond to the fact that they could have been recalled Urquizo during the defendant's case in to, to lodge that particular cross examination that you say was missing when Urquizo originally testified? Obviously, they'd be able to say, didn't you testify on direct examination when the government was asking you questions that these questions that you didn't access any tablets? Didn't you tell you, you know, girlfriend a that you looked at your mech shot on, on, on your homies, uh, on your homies, uh, tablets, etcetera. That would have been pretty damning cross examination. I think that would absolutely your honor. And I just want to clarify that we did not identify the Urquizo calls during the trial itself. We identified those three calls after trial. We were continuing to review phone calls throughout the trial, but those three did not come on our radar until afterwards. And the other thing I just wanted to point out with respect to the materiality of those calls and of Urquizo's lie about the tablets is that, you know, one of the strengths of the government's case was that it had defendants who had access to the tablets, but then it had informants who did not. And it used the informants who did not to, to, as, as credibility boosters, right? That people who didn't have access to this evidence are saying the same thing as the people who did. So being able to impeach the, the two witnesses who did not have access to those tablets against Mr. Baca with evidence that they were, they were made a big difference in the case against him, particularly that with Duran, right? I mean, you caught him lying. We did do it on Duran. Yes, but it would have been more effective to do it on both of them, that there are only two witnesses who are supposedly testifying completely from their memory and they both access the tablets, recognize the importance of the tablets and then lied about accessing them. So after the top, after the calls were disclosed and we were trying to process them in December 21st, 2017, so two months before trial, the government disclosed another 10,000 pages of recording of documents and recordings, all of which was material to the trial presentation. So we began, we're processing phone calls and now we're processing an additional 10,000 documents in the two months before trial. Then in January 12th, 2018, two weeks before trial, the government disclosed almost 7,000 pages of additional discovery, all of which was relevant to the trial on defendants. It was, it was part of it was Jenks, part of it was Brady. It was summaries of interviews, et cetera. So now in the weeks when we should be going through the jury questionnaires and finalizing our presentation, we have a 7,000 pages of documents being dumped on our laps to try to process. Then, I guess one of the questions I have is that it must have been apparent at least two months before trial that you were drowning in new production. And yet the motion to basis of discovery abuses wasn't made until the last minute before trial. Why not? Your Honor, we were trying desperately to make the trial date. We were trying to process the phone calls. We were trying to process the new discovery. And it just became apparent, I think, with the disclosure on January 12th, that 7,000 pages, that we just we couldn't do it at that point, that it was too much. And we we continued to try. I think that the fact that it was, it wasn't us, you know, trying to get a strategic advantage. It was us really working hard to make that date. And then finally realizing we just can't do it, that we have too much information to process. And we cannot continue with this trial. Because it was too much. So even after the trial started on January 29, in Wadir, the government disclosed another 3,000 pages of discovery that was relevant to the trial. And the next day, an additional 65 pages of discovery. And that 65 pages included the FBI questionnaire that we've talked about before. So we're processing that, that document in the context of basically 3200 pages of new discovery and jury selection, which was just impossible to do. And that's why we're not able to use it until our case with Sinato, Agent Sinato, rather than being able to use it in original cross examinations with the various cooperating witnesses and in opening to be able to say that the the cooperating witnesses not only had access to all this discovery, but they also had access to a roadmap of the government's case. And that those two things together rendered all of their testimony unreliable. And then finally, I know I'm running out of time. So I just want to cover, you know, throughout the trial, we ended up with another almost 2000 pages of discovery. And that almost 2000 pages of discovery included the agent notes that we discussed in our brief, including evidence that Mr. Arquizo had made exculpatory statements as to Daniel Sanchez, which would have obviously directly exculpated Mr. Sanchez, but also further impeached Mr. Arquizo. In addition, we received almost 1000 pages of documents related to Mario Rodriguez, who's a key witness against everyone who is facing trial in trial one and included evidence that he had fabricated testimony and that he had improperly accessed records in addition to admitting to other crimes that would have impeached him. And I see I'm out of time. So unless the court has further questions, I rest on the brief. Judge Briscoe, do you have any questions? I do not. Judge McHugh, do you? No, I do have a couple of questions. One is on you mentioned about Mario Rodriguez. As I understand it, one of in one of the four categories that Mr Bach is raising on the Brady issue is the Mr Rodriguez's call to his mom in November of 2017. Well, and you say that without that is you know, there's differing accounts about how incriminating his testimony actually was about Mr Baca. But let's say, let's say it was damning. We know that he told the FBI in October and November of 2017 that he did not know whether Baca had called the hit on Molina, and he could only speculate about Baca's involvement in November 2017. During the very time period that he is telling the FBI that he tells his mom, Well, they're not gonna have me testify about pup because I really don't have anything to say about about pup. Well, that's exactly what he told the FBI. And so in in in pup Papa Baca did have that information about the prior statements to the FBI discounting the role of Baca. So I'm not sure that how how much his talk is called to his mom really would have made a different. It affected anything. You know, the earlier statements we were able to impeach with with what he said to the FBI and to the extent it was contrary to what he was testifying to a trial. But the call to his mom was far broader. It was saying I don't have anything about pup. I have no information to give, and that is contrary to what he testifies to a trial where he provides a wealth of potentially inculpatory information about Mr Baca. I thought about Mr Baca was, you know, when he consoled Rodriguez in Santa Fe, saying, Well, you know, I'm sorry you and the good brothers have, you know, got swept up in this. He was supposed to have been killed years ago, you know. So I mean, is there anything else that I missed? I think that he was supposed to be killed years ago is a critical part of the government's theory against Mr Baca that in 2013 Mr Baca had spoken to several co conspirators about the plan to kill Mr Molina. So Mario Rodriguez's testimony was an important part of that part of the government's case, and that was new, and that was clearly incredibly inculpatory. And yet, and it's so inconsistent with his statements to his mother that he didn't have anything inculpatory to say about Mr Baca. Okay, only other question. I'm sorry to occupy, but with Mr Kizzo on the calls to his girlfriends. Um, as I understand it, um, the only argument that had been made to Judge Browning was that that that that that those recorded calls show that the government had endorsed perjury, not a separate constitutional violation involving Brady. So I have a question about preservation on the keys. Oh, calls to his girlfriend. So if I'm wrong about that, no, no, Your Honor. I mean, we certainly we argued broadly that all of the evidence was exculpatory and violated Mr Baca's Brady rights to it. But we did not specifically argue with your keys. Oh, calls that had been disclosed too late for us to use it at trial. But nonetheless, under the plain air standard, this court should consider it. It was part of that 16,000 hours of phone call dumped on us two months before trial. Um, that was on the government. The government had very intentional, dilatory discovery practices that clearly prejudiced the defense. The evidence was, you know, patently exculpatory. It should have been disclosed to us. We know that the government was reviewing calls before trial because it was disclosing 302s of the ones that it found to be important. Um, so I think that the court so I do think it falls within the umbrella of our General Brady claim. But even if we did not preserve that specific argument under plain error, it's still a grounds for reversal. And it's certainly evidence of why the district court should have granted a continuance. Because had it done so, we would have had access to that call and been able to use it at trial. Okay, I just want to make sure my colleagues don't have any additional follow up. Uh, I'm fine. Thank you. Fine. All right. Thank you very much. Uh, Miss Duncan and we'll hear from Mr Williams. I'm going to give you an additional, uh, minute. And again, you don't have to use it. It's yours. Yes, sir. Richard Williams for the United States to follow up regarding the Lupe Orkizzo calls. Those were not preserved, so should be reviewed only for plain error. Uh, the question is whether the timing of those calls, um, uh, undermines confidence in the verdict. Um, Lupe Orkizzo was impeached with with other calls, calls with his sister, uh, brother. Um, other witnesses also were impeached with several occasions. Um, the calls themselves, um, didn't provide a stark contrast. Um, they merely indicated that he had seen his mugshot. They didn't say that he had reviewed all of the discovery carefully enough to be able to digest it and, uh, synchronize it with what other people testified to. Um, he testified that he had access to the state discovery when, um, several of the defendants were charged in state court and had reviewed that he indicated that he had access to the, the Rico indictment. Um, and, um, so the, the calls that he had seen his mugshots, um, don't enhance the quality of the of other ways. He was impeached for lying to Mr Sanchez investigators. He was impeached with inconsistent statements, impeached with failure to tell the FBI information, increased impeached with his criminal history with his benefits. Um, additionally, we've got all of this other information. It does seem like it's pretty good evidence of perjury because it seemed to be that he unambiguously testified that he didn't have access to anybody's tablets. And he told, you know, I think each one of his girlfriends released two of them that he actually looking at his mugshot, but he didn't win that a kick. So he obviously was not telling the truth when he was answering the government's questions on direct. And I would suggest that the calls themselves refer to the mugshots. They don't refer to him reviewing anything else on the tablets or anything about how long he may have had access to a tablet or anything like that. So as to be able to, um, digest all that type of information that really goes to the defense theory that all of the witnesses were coordinating. Um, didn't he testify? He read a letter written by Mr Baca on the tablet. I'm not sure about that, Your Honor. I mean, I'm not that he testified that he there were in the excerpts cited in the brief, there were references to him being aware of other things on the tablet and in the discovery, suggesting that he had talked to other people about the discovery that was out there about the strength of the government's case. But as to what he had actually seen, I believe the excerpts refer to him seeing only his mugshots. Uh, another reason that that disclosure is not material is that, um, he was not a critical witness. Um, they're, um, with respect to Mr Baca or, um, numerous other witnesses who, um, provided incriminating testimony. Most significantly, Eric Duran testified about Mr Baca's recorded recorded statement about enforcing the Molina hit. He testified about Mr Baca's recorded statement about threatening, uh, Jerry Armenta's family, one of the defendants who at that point was known to be cooperating. He, Mr Duran testified that Baca told him in 2013 of the plan to murder Molina. Um, Manuel Jacob Armijo testified that in 2011, um, another SNM member, Jonathan Gomez, said that there was paperwork and Baca wanted Molina hit. Uh, another former SNM member, Roy Martinez, testified that in 2013 Baca said that Molina needed to be killed. Uh, David Calvert testified that in 2014, um, Cheech, uh, an SNM member named Martinez gave Calvert the paperwork at PNM North and told him that Baca wanted him to take it to Southern. Um, and on the impeachment point relating to, uh, the tablet and seeing the discovery, um, both Calvert and, uh, Lupe Arquizo were impeached about their opportunity to meet together prior to when Calvert, um, decided to cooperate. Um, Timothy Martinez testified that after the murder, Baca told him that the corrections department didn't take him seriously. And now they have a body on their hands. There was abundant evidence that Mr. Baca was the leader of the SNM, uh, from Javier Rubio, um, Billy Cordova testified he was the F. A. Um, there was significant evidence about the important. I didn't mean it. I didn't mean to talk over you. I had questions, but I want you to finish. Okay. There was significant evidence about the importance in the SNM of following leaders and following orders. Um, for example, Federico Munoz testified about killing a rival gang member, um, at a barbershop, because if you see a rival, you have to act on it. He also testified about killing, um, another person named Felix Martinez because the SNM leader at the time, Angel Munoz told him to do so because Martinez had had dual gang membership. Um, Mr. Armijo testified that, um, when he had heard about the paperwork earlier on Mr. Molina, that he put out an order not to touch Molina because he hadn't seen the paperwork and verified it. But he testified that he, if he had seen it and had it, then he would have had to follow through because that was his job as a leader, even though he liked, um, even though he liked Molina. Um, so my question was, when you started all of that, I mean, it seems like you made a pretty powerful argument for harmlessness. But you started that by saying that that that that shows that her keys is not a critical witness. And a lot of what you just recounted was once they had gotten to the southern facility in Las Cruces, there was all of this discussion about paperwork. There never would have been any paperwork had not Baca and and Kizzo collaborated when they were in Santa Fe and knowing that her Kizzo was ultimately going to be transferred to, uh, to my lost cruces where Molina was that he was entrusted to take the paperwork that from Baca. And so, boy, if there's anybody that was a critical witness of the Molina murder, it seems to be that it was her Kizzo because the whole theory of the government was that it was all contingent on the paperwork. We just discussed the fact that he didn't get killed in 2011 and 2012 because nobody entrusted the existence of the paperwork. Now everybody trusted the paperwork. But that's only because Molina Baca had her Kizzo in Santa Fe. Take the paperwork in his legal material down to Santa Fe. So so how can you say even with up what you just presented, uh, that or Kizzo was not a critical witness because Mr Calvert testified that he got the paperwork at PNM North and took it to PNM South. And that's where he gave it to Mr Orkizzo. And then Mr Cordova testified who went that he was at the yellow pod at southern in Las Cruces when Mr Kizzo arrived with the paperwork. And then there's all the additional testimony you just mentioned about the existence of the paperwork. So Mr Orkizzo wasn't critical to the evidence that the paperwork traveled from, um, Santa Fe to Las Cruces and was not critical to the evidence of the case against against Mr Baca or anyone else. Turning to Mr Rodriguez, he similarly was not a critical witness against Mr Baca or anyone else. Um, for all of the reasons that I mentioned previously following up on the significance of the impeachment with the telephone call with his mom, um, I would suggest that the district court got it right when it found that what he said on the call was not that inconsistent with, um, with his testimony that he was cross examined about his early debriefings with the FBI and not providing information about Mr Baca. And indeed, the testimony ultimately provided wasn't that Mr Baca called to hit. It was more that, um, he was sorry that this had happened and that it should have happened, happened earlier. So in that way, um, wasn't, um, material doesn't undermine confidence, um, in the verdict. Um, Mr, uh, Rodriguez was impeached, uh, also in a variety of other ways. Um, at trial, um, he was disclosures, um, uh, with the FBI. Um, he was impeached with prior inconsistent statements, failure to provide information, criminal history, um, deceitful conduct, uh, including to, um, admitting in state court to a criminal sexual penetration charge, but denying that he actually did it said he had pled to it to enhance his image. Um, Mr. Montoya was, um, questioned about the letter. Mr. Rodriguez submitted in connection with the state case, uh, on Montoya's behalf, when the people charged in state court or, um, trying to, um, perpetrate a fraud on the state court about who actually was involved. Um, and, and as to the, the argument that, uh, Mr. Martinez, I'm sorry, Mr. Rodriguez's, um, call is significant because he would have no reason to lie to his mom, um, I would suggest that it's not clear that, um, it would have been a lie based on his testimony, um, about Mr. Baca being so different than the testimony he provided about the people who were in Las Cruces, where he had more direct incriminating evidence about Mr Sanchez and Mr Herrera. Sure. Not good. You know, uh, is your adversary pointed out for him to testify that, uh, at the trial that well, Rodriguez is showing you got caught up in these other good brothers because he passive tense. He was supposed to have been killed a few years ago when all of the testimony that you just elucidated was that Baca was the leader. And so, you know, implicitly, he was supposed to have been killed two or three years ago because he had ordered belated to be killed. And guys, you know, if you're a defense lawyer, that's not a very good thing to hear. That's pretty damning. Yes, sir. But as to what he actually said, it wasn't that he testified that Baca told me he had called it. It said that Baca said that he was sorry that they got caught up into it because he was supposed to be killed, right? He was supposed to be killed years ago. Correct. Not that he had called it would be the distinction that I believe I would suggest that the district court was was relying upon. Um, let me let me murder. It's 1989. Um, and it's a murder. I mean, it's a it's as prejudicial as I can imagine for testimony to be. And it's really old. Why should that have been allowed in? Because it was probative to the longevity of the S and that there's that we have case all that talks about long longevity. But I mean, you know, it doesn't say that you have to show existed from the beginning of time. And I mean, this is a very old charge that's being brought in. And it's, it seems to me it's pretty sensational, particularly where you've got, um, you know, Mr. Baca being the one who actually carries out the murder in that case. I mean, shouldn't shouldn't that have been excluded under 403? Well, I would, I would suggest that, um, the court could have done a 403 analysis and come to that conclusion and been within its discretion. But it's not an abuse of discretion that it didn't. And particularly in light of the lack of any argument that it wasn't probative because of this abundance of alternative enterprise evidence that that wasn't presented to the district court. So, um, this court didn't have a chance to rule on it, but was presented to the district court, um, was the argument that it wasn't connected to the, to the S and M. Um, for example, in February of, uh, February 7th, um, during Mario Rodriguez's testimony, um, Baca argued regarding the 1989 murder that the S and M gang affiliation never came up during the state trial, arguing that it's not related to the S and M. And in fact, at around the same time, by contrast, regarding the evidence of the threats to Mr. Armenta's family, Baca objected as to it and argued that it was more prejudicial and probative and argued that they have more than enough racketeering activity. But then as to the 1989 Baca murder, that was not the argument that was being made. Uh, the court at that time continued to find that it wasn't sufficiently gang related. Um, short time later, um, Baca argued, um, that there's no dispute that Mr. Baca was convicted of the murder in 1989. So I think that's in dispute is whether it's gang related. Um, and it wasn't until the court heard additional testimony and concluded that the, um, that it was relevant to the link to the S and M because of following orders that it allowed it in. I would note as I'm about to run out of time that even if good evidence, though, was there that he was following orders from someone in S and M. It wasn't a particular order from a particular person. It was the rule of the S and M that you retaliated when you were disrespected. I get that. So, so where can I find in the record that it was an order that it emanated from someone within within S and M that somebody told him? I know that's what Judge Browning said, but I'm wondering why he said it. Where can I find evidence that anybody told Baca to kill Villasquez? And I'm not aware of that evidence. I think the point is that it was a rule of the S and M that when you are disrespected, you retaliate. Um, and particularly in the way he did it, um, where it was open and in an area where he could be seen. And so it was clear what he was doing and that it was connected with the S and M. Uh, I see that I'm out of time. Uh, Judge I don't. Uh, Judge McHugh. No, I don't. Okay. Uh, I think we've used up your rebuttal time. I'm afraid, uh, Miss Duncan. Um, again, I thought the arguments were very well presented in your recent arguments today. This matter will be submitted.